UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------ x
SCOTT PARSONS, :
LOUISE CZAR, :
                             Plaintiffs, :  **MEMORANDUM &**
                                      :  **ORDER GRANTING**
     -against- :  **DEFENDANTS'**
                                        :  **MOTIONS FOR**
MATTHEW FUNCHION, NICHOLAS CAEZ, :  **SUMMARY JUDGMENT**
JOHN T. SPARKS, :
                            Defendants. :  3:21-CV-01340 (VDO)
------------------------------------------------------------------ x

**VERNON D. OLIVER**, United States District Judge:

      Plaintiffs Scott Parsons and Louise Czar sued Defendants Matthew Funchion and Nicholas Caez, Connecticut State Troopers, and John T. Sparks, a firefighter, for issues arising out of two separate but semi-related incidents. The defendants—the troopers together and the firefighter separately—have now moved for summary judgment on all of the plaintiffs' claims. For the following reasons, both motions are **granted**.

I.  **BACKGROUND**[1]

    A.  **Factual Background**[2]

        1.  **The Parties**

Scott Parsons and Louise Czar are residents of Litchfield who served in the local fire department—Parsons the former Chief and Czar a dispatcher. (Sparks' 56(a)1, at 1.) They are outspoken critics of local law enforcement and the fire department, maintaining a sign on their lawn naming various organizations and their members as part of a "Liar's Club." (*Id.*; Sparks' Mot., Exhibit A, ECF No. 49-3, at 7.)

---

[1] The facts are taken from Defendants' Local Rule 56(a)1 Statement of Undisputed Material Facts ("Sparks' 56(a)1," ECF No. 49-2) ("C&F's 56(a)1," ECF No. 52-2), Plaintiffs' Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment ("Pls.' Sparks 56(a)2," ECF No. 60-1) ("Pls.' C&F 56(a)2," ECF No. 61-1), the Second Amended Complaint ("SAC," ECF No. 33), and the record. The facts are recounted "in the light most favorable to" Plaintiff, the non-movant. *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 345 (2d Cir. 2021). The facts as described are in dispute only to the extent indicated.

[2] While the facts are taken from Plaintiffs' filings as well as Defendants' filings, the Court notes that the plaintiffs have failed to follow the Local Rules in their filings. As pointed out by Defendants Funchion and Caez, the plaintiffs' filings fail to point to specific parts of the record for some assertions. ("C&F Reply", ECF. No. 65, at 2.) Where they do point to specific parts of the record, their assertions are often unsupported. (*Id.* at 3–4.) The result of Plaintiffs' failure to follow the rules and to act with the integrity expected of members of the bar is an increase in work for the Court and the defendants, who have been left to piece together the plaintiffs' arguments for them.

At summary judgment, the Court construes all facts in the light most favorable to the nonmoving party. Here, that is the plaintiffs. But the Court's construal in Plaintiffs' favor is significantly harder to do when the plaintiffs present contradictory assertions or misconstrue the facts—the Court is left unable to rely on Plaintiffs' filings and must sift through the evidence to find the facts most favorable to the plaintiffs itself. That is what this Court did, to maintain fairness to the plaintiffs and meet the standard for summary judgment.

While the Court declines to issue sanctions at this time, *see* D. Conn. L. Civ. R. 56(a)(3), it does feel the need to put Plaintiffs' counsel on notice that this Court takes the bar's ethical duty seriously.

Defendant John Sparks is a member of the fire department. (*Id*.) Defendants Matthew Funchion and Nicholas Caez are state troopers. (C&F's 56(a)1, at 1, 3.) All three have had varying degrees of interaction with Parsons and Czar. According to the plaintiffs: "Sparks knew Parsons and Czar from their shared membership at the fire department and claimed they had a 'bad history.'" (Pls.' Obj. to Sparks, ECF No. 61, at 2.) "Caez and Funchion knew of Parsons and Czar from their law enforcement functions: among other things, Parsons had made a formal complaint about Caez, and Funchion had been sued for defamation by Czar." (*Id*.) Caez claims to have never met Czar or Parsons, know of Czar's former role in the department, know of complaints filed against him by Parsons, or to be aware of their public criticism in any form. (C&F's 56(a)1, at 3.) Funchion claims he never met Parsons before August 18, 2019, nor did he know what he looked like. (*Id*. at 8.) He says he was generally aware of their lawn signs but did not make the connection between the signs and Parsons until after the incident. (*Id*.) Funchion's name was not on the signs before his altercation with Parsons. (*Id*.) Sparks claims he is listed on one of the signs because of his participation in an investigation into Parsons during his time as Chief. (Sparks' 56(a)1, at 2.)

### 2. June 9, 2019

On June 9, 2019, Caez was called to Sparks' home to address a complaint of an erratic driver on a motorcycle. (C&F's 56(a)1, at 1.) Sparks claimed that a yellow Harley Davidson—believed by Sparks to be owned and operated by Parsons—swerved into his lane as he drove. (*Id*.) At the time, Sparks was driving with his wife and three-year-old daughter. (Sparks' 56(a)1, at 2.) Caez then went to Parsons' address down the road. (C&F's 56(a)1, at 2.)

When Caez went to Parsons' home, he observed Parsons in the garage with a yellow Harley. (*Id*.) Caez knocked on the front door, where Czar met him and yelled "do you have a

warrant?" and "get off our property!" before shutting the door. (*Id*.) Caez then returned to Sparks' home and took a written statement on his cruiser computer terminal. (*Id*.) During this process, Caez looked at the information in his system on Parsons and Czar, confirming that the Harley belonged to Parsons and reviewing basic identifying information about Czar. (*Id*. at 2–3.) Dispatch personnel ran a full search on Czar, pulling her vehicle registration. (*Id*.) Caez completed his report and processed an infraction for Parsons, which he mailed to Parsons' address. (*Id*. at 3.) Caez claims not to have been motivated by Parsons' and Czar's advocacy or other improper motive. (*Id*.) Sparks claims the same. (Sparks' 56(a)1, at 4.)

### 3. August 18, 2019

On August 18, 2019, Funchion was called to the scene of a fire on Bantam Lake Road to assist with visibility. (C&F's 56(a)1, at 3.) As he drove, Funchion's lights and siren were active. (*Id*. at 3–4.) He observed a "bald white male, with no shirt, wearing shorts, standing on the right shoulder," who he later identified as Parsons. (*Id*. at 4.) Parsons stepped into the lane and waved his arms and hands at Funchion. (*Id*.) To avoid harming Parsons, Funchion slowed down and drove around him; Parsons in turn stepped further into Funchion's path. (*Id*.) According to Funchion, had he not moved and had oncoming traffic not swerved away from him, a traffic incident would have occurred—either striking Parsons or a collision between Funchion and another vehicle. (*Id*.)

After responding to the fire call, Funchion returned to the location and found Parsons there. (*Id*. at 5.) As he approached, his lights were on and the car faced Parsons. (*Id*.) Parsons then began walking in the opposite direction and ignored repeated commands to stop by Funchion. (*Id*.) After a few attempts to stop him verbally, Funchion called for backup. (*Id*.) Funchion then placed Parsons under arrest. (*Id*.) Parsons resisted and lunged towards the

4

officer, yelling "you can't arrest me!"[3] (*Id.*) Funchion backed away from the lunge and dropped his handcuffs. (*Id.* at 6.)

Parsons resumed walking away. (*Id.*) Funchion pulled out his taser and, according to him, told Parsons to get on the ground and place his hands behind his back or be tased. (*Id.*) Parsons claims that he was not ordered to do anything. (Pls.' C&F 56(a)2, ECF No. 60-1, at 8.)[4] Either way, Parsons did not comply and kept walking away. (*Id.*) As backup had not arrived, Funchion tased Parsons in lieu of trying to tackle him or take him down without backup. (*Id.*)

Czar then emerged from her house and began filming the incident.[5] (*Id.*) When the taser recharged, Funchion told Parsons again to submit to arrest. (*Id.* at 6–7.) Parsons resisted and placed his hands under him to avoid cuffing. (*Id.* at 7.) Funchion tased him again. (*Id.*) Parsons submitted to arrest as the second tase began, so Funchion powered the taser down instead of letting it finish its cycle. (*Id.*)

Two more troopers arrived. (*Id.* at 8.) Czar continued recording and kept approaching the situation. (*Id.* at 7.) Funchion claims he did not try to stop her from filming or tell her not do so. (*Id.* at 8.) Czar claims Funchion threatened to tase her if she did not move away from the incident. (Pls.' C&F 56(a)2, at 12.)

---

[3] Parsons disputes walking away from Funchion, ignoring repeated commands, and lunging at Funchion in his filings, but pleaded guilty to doing so. (Caez & Funchion Mot., Exhibit E, ECF No. 52-7 at 1–4.) The Court thus need not take these facts from Parsons' view.

[4] He also claims that he did not hear the commands because he was not wearing his hearing aids that day, but that would be different than the commands not occurring. While this Court is required to take inferences in Parsons' favor, his guilty plea combined with the discordance between his two positions—no commands occurred or no commands were heard—leaves this Court with the conclusion that the commands occurred without Parsons having heard them.

[5] Czar later deleted this footage. The Court does not have Czar's recorded video on file.

Funchion then canvased the area with other officers to determine who else might have seen the incident. (C&F's 56(a)1, at 8.) Parsons was arrested for Disorderly Conduct, Reckless Endangerment Second Degree, Criminal Attempt to Commit Assault on a Peace Officer, Interfering with Police, and Reckless use of the Highway by a Pedestrian. (*Id.* at 9.) He pled guilty to resisting arrest and reckless endangerment. (Caez & Funchion Mot., Exhibit E, ECF No. 52-7 at 1–4.)

### B. Procedural History

Parsons and Czar brought this case in October 2021. Their Second Amended Complaint is the operative Complaint, filed in June 2022. They brought six claims (against all defendants unless noted): (1) retaliation in violation of the First Amendment; (2) abuse of process against Caez and Sparks; (3) intentional infliction of emotional distress ("IIED"); (4) excessive force in violation of the Fourth Amendment against Funchion; (5) assault and battery against Funchion; and (6) violation of 18 U.S.C. § 2724 (the Federal Drivers Privacy Protection Act ("FDPPA")) against Caez and Sparks.[6]

## II. LEGAL STANDARD

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant

---

[6] Sparks is subject to Counts One, Two, Three, and Six. Caez is subject to Counts One, Two, Three, and Six. Funchion is subject to Counts One, Three, Four, and Five. No one is subject to all six. All three defendants are subject to Counts One and Three.

or unnecessary" are not material and thus cannot preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. *Id.* The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). However, if the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof and submits "merely colorable evidence," then summary judgment is appropriate. *Celotex*, 477 U.S. at 322–23; *Anderson* 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). There must be evidence on which the jury reasonably could find for it. *Dawson v. Cnty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).

### III.   DISCUSSION

This case involves two plaintiffs separately and jointly making six claims arising from two incidents and varying among three defendants. The Court will discuss each claim

individually, making clear which combination of litigants the claim applies to and for what time period.

### A. Count One: First Amendment Claims

Both Parsons and Czar allege that all three defendants acted, whether by pulling Czar's information, giving Parsons a ticket, or investigating and arresting Parsons, in retaliation for exercising their right to speak. More specifically, the plaintiffs believe that the actions in this case would not have occurred but for their public criticism of the various organizations on their lawn signs. The Court disagrees.

Generally, the analysis of a First Amendment retaliation claim entails determining whether the plaintiff has shown that: (1) an interest protected by the First Amendment exists; (2) the defendants' actions were motivated or substantially caused by the plaintiff's exercise of that right; and (3) the defendants' actions effectively chilled (prevented from recurring) the plaintiff's exercise of that right. *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998). The test is conjunctive: if all three prongs are not satisfied, then the claim fails. *Id.*; *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

Neither party disputes the first prong: the plaintiffs' signs are speech protected by the First Amendment. This leads the Court to the next two prongs: whether the defendants were motivated by the plaintiffs' speech, and whether that speech was chilled. The plaintiffs argue that none of the actions in this case would have occurred but for the defendants' intent to chill, or silence, their speech. But the Court need not resolve that issue, as the plaintiffs admit that the defendants' actions had no effect on their speech. (Pl's Opp. to Caez & Funchion, ECF No. 62, at 8; Pls.' Opp. to Sparks, ECF No. 61, at 7.; Pls.' C&F 56(a)2 at 5.) In place of alleging

8

any actual chilling, the plaintiffs urge this Court to recognize "other harm[s]" as substituting actual chilling. *Id.* (citing *Zherka v. Amicone*, 634 F.3d 642 (2d Cir. 2011)[7]).

The Second Circuit has accepted other harms in place of actual chilling in narrow contexts. In *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, a retaliatory revocation of building permits sufficed to substitute actual chilling. 282 F.3d 83, 91 (2d Cir. 2002). And in *Gagliardi v. Vill. of Pawling*, failure to enforce zoning laws met the test. 18 F.3d 188, 195 (2d Cir. 1994). In both cases, the public actors lacked any genuine basis for taking the retaliatory actions they took. *Dougherty*, 282 F.3d at 91–92; *Gagliardi*, 18 F.3d at 195. Moreover, in both cases, a temporal nexus existed between the retaliatory actions and the speech involved. *Dougherty*, 282 F.3d at 91–92 (noting that the revocation took place during the legal proceedings, after conflict over the course of five years); *Gagliardi*, 18 F.3d at 195 (noting that the zoning laws went unenforced over the course of nine years even after the plaintiffs began complaining). As for the other two cases the plaintiffs cite, *Zherka* and *Gill v. Pidlypchak*, the Court explained that while the *Dougherty* and *Gagliardi* plaintiffs "adequately pleaded non-speech injuries," litigants must still generally allege actual chilling. *Zherka*, 634 F.3d at 645 (citing *Gill v. Pidlypchak*, 389 F.3d 379, 383 (2d Cir. 2004)).

Plaintiffs here do no such thing, urging this Court to see "the malicious disclosure of their protected information" and the "use of excessive force" as sufficient to substitute actual chilling. As explained below, those acts were legally valid. And neither act contained any temporal nexus to the plaintiffs' speech. By their own admission, the plaintiffs' criticisms of

---

[7] Note that the plaintiffs failed to cite to anywhere specific in *Zherka*, a repeat problem in their filings raised by the defendants.

the public organizations date back years and continue today. (Pls.' Opp. to Sparks, ECF No. 61, at 1.) Even taken in the light most favorable to them, Plaintiffs' First Amendment claims fail as a matter of law.

### B. Count Two: Abuse of Process

The plaintiffs next claim that Caez and Sparks committed an abuse of process against them in the actions leading to Parsons' vehicle infraction. At the outset, Parsons does not claim that Sparks or Caez improperly accessed his information—nor does he dispute Sparks' claims about his driving—so the only plaintiff bringing this claim is Czar.

"An action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed." *Larobina v. McDonald*, 876 A.2d 522, 528 (Conn. 2005).[8] From this, the Court can adduce two elements: (1) legal process; and (2a) done in an improper manner, or (2b) to accomplish a purpose for which it was not designed. Czar's claim fails at step one, as no legal process was brought against her by either defendant. Caez issued the infraction for Parsons, and pulling Czar's information does not constitute "process." Black's Law Dictionary (11th ed. 2019) (defining process as a "summons or writ, esp. to appear or respond in court"); *Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 114 (2d Cir. 1996) ("In short, no matter what misconduct by the tortfeasor occurs before the commencement of suit, it is not, in itself, an abuse of process because there is not yet process to abuse."). As no legal process took place against Czar, and as she was not required to appear before any legal body, her claim fails.

---

[8] The plaintiffs do not specify whether this claim arises under Connecticut common law or 42 U.S.C. § 1983. The Court cites Connecticut common law, as § 1983 claims for abuse of process require analysis of state law elements. *Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 958 n.5 (2d Cir. 2015).

### C. Count Three: Intentional Infliction of Emotional Distress

Both plaintiffs claim Intentional Infliction of Emotional Distress ("IIED") against all three defendants. To recover damages for such a claim, a plaintiff must show: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe. *Petyan v. Ellis*, 510 A.2d 1337, 1342 (Conn. 1986). Both plaintiffs testified under oath that Sparks' actions did not give them "severe" emotional distress, so the analysis of Plaintiffs' IIED claims against Sparks stops there. (Sparks Mot., Exhibit A, ECF No. 49-3 p. 51, lines 16–25; p. 52, lines 1–25; Exhibit B, ECF No. 49-4 p. 40, lines 1–25; p. 41, lines 1–25.)

As to the claims against Caez and Funchion, neither officer's conduct could be considered "extreme and outrageous." To demonstrate extreme and outrageous conduct in Connecticut, a plaintiff cannot simply allege "insults, indignities, [or] annoyances." *Brown v. Ellis*, 484 A.2d 944, 946 (Conn. Super. Ct. 1984); *Petyan v. Ellis,* 200 Conn. 243, 253 (Conn. 1986). Actions have to be "beyond the pale" to meet the bar of an IIED claim. *Bradley v. Comley*, No. CV075005136, 2009 WL 5342481, at *7 (Conn. Super. Ct. Dec. 2, 2009).

The court begins with Plaintiff Czar's claims. She claims emotional distress because, at worst,[9] (1) Funchion threatened her while she approached him arresting Parsons; and (2) Caez accessed her information. (Pls.' Opp. to C&F, at 19.) Neither comes close to the standard

---

[9] The parties dispute whether Funchion actually threatened Czar when she approached to record the arrest. The Court, following precedent, takes the facts in the light most favorable to the non-moving party. Here, Czar.

11

Connecticut courts require from plaintiffs. *See, e.g.*, *Petyan,* 510 A.2d at 1342. An admonition from an officer actively arresting someone is hardly outrageous or even uncommon. Nor is an officer requesting motor vehicle information.

Parsons' claim against Caez fails for the same reason. And regarding his claim against Funchion, it is well-established that a claim of IIED will fail for conduct involving an arrest supported by probable cause. *See, e.g.*, *Pal v. Cipolla*, No. 3:18-CV-616 (MPS), 2020 WL 6881455, at *21 (D. Conn. Nov. 23, 2020) (granting summary judgment on a similar claim for IIED). Given Parsons' guilty plea and conviction, as well as the lack of excessive force in this case, III.D *infra*, Funchion's actions fall well short of the extreme and outrageous requirement for an IIED claim in Connecticut. *See, e.g.*, *Cameron v. Fogarty*, 806 F.2d 380 (2d Cir. 1986) (holding that a conviction serves as a defense to "a § 1983 action asserting that arrest was made without probable cause"). None of the plaintiffs' emotional distress claims hold water against any defendant.

### D.   Counts Four and Five: Excessive Force

Parsons claims that Funchion violated the Fourth Amendment by tasing him twice during the arrest.[10] He further claims assault and battery under Connecticut law. The Court groups these claims together, as the test for state law assault and battery claims is essentially the same as the one used to analyze a Fourth Amendment excessive force claim. *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 398 (S.D.N.Y. 2013); *Posr v. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991); *Outlaw v. City of Hartford*, No. 3:07–cv–01769 (GWC), 2015 WL

---

[10] Czar also claims excessive force against Funchion, for allegedly threatening to tase her. Threats, however, are rarely if ever enough to support a claim for excessive force or assault. *See, e.g.*, *Gerard v. City of New York*, 843 F. App'x 380, 382 (2d Cir. 2021).

13646918, at *1 (D. Conn. May 5, 2015). That test is one of "objective reasonableness" and involves balancing three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004); *Papineau v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006).

At the outset, the Court notes that the third factor leans heavily in Funchion's favor for both tasings. Parsons cannot dispute whether he resisted or attempted to evade arrest. He pled guilty to both. (Caez & Funchion Mot., Exhibit E, ECF No. 52-7 at 1–4.) *See Tracy v. Freshwater*, 623 F.3d 90, 99 (2d Cir. 2010) ("[A] conviction for resisting arrest may preclude a subsequent excessive force claim.").

The crime Funchion sought to *initially* arrest Parsons for is unclear. When Funchion arrived and parked his car, he first attempted to speak with Parsons before ordering him to stop. While Parsons did obstruct traffic and endanger those on the road with his recklessness,[11] Funchion did not declare his intent to arrest Parsons for his actions at the time. Were this the end of the interaction, Parsons might prevail on his claims. But Parsons ignored Funchion's command to stop and speak with him or face arrest, failed to comply with Funchion's attempt to grab his wrist, and finally lunged at Funchion.[12] At that point the crime became interference, and Parsons became a threat to officer safety. *See, e.g.*, *MacLeod v. Town of Brattleboro*, 548 F. App'x 6, 8 (2d Cir. 2013) (finding taser use reasonable to subdue an actively noncompliant,

---

[11] Parsons disputes this, but again his guilty plea requires the Court to see otherwise. (Caez & Funchion Mot., Exhibit E, ECF No. 52-7 at 1–4.)

[12] Parsons disputes this as well, but see fn. 3 *supra*.

threatening suspect); *Tracy*, 623 F.3d at 97 (finding an officer's use of a flashlight to fend off a suspect reasonable after the suspect made a quick movement toward him). And while Parsons may not have heard the commands, the inquiry is based on the reasonable officer's understanding. *Id*. As Funchion was faced with a person who had already obstructed traffic and refused to speak with him, his actions are reasonable in context. The first and second factors, then, also lean in Funchion's favor. This is particularly true given Funchion's lack of backup, leaving him alone with a resistant Parsons and an approaching Czar.

As to the second tasing, the factors also lean in Funchion's favor. While Parsons, an older man than Funchion, was on the ground, he still refused to submit to arrest. By placing his hands under his back and ignoring further orders, he actively resisted arrest and led Parsons to fear for his safety. Moreover, backup had not yet arrived and Funchion was faced with a second antagonist in the form of Czar. Given the escalation of events and the potential for an attack from Czar or Parsons, Funchion's second use of the taser also meets the requirements for "objective reasonableness." *Amnesty Am.*, 361 F.3d at 123.

Given the Court's finding that Funchion did not violate clearly established law, it sees no need to wade into the murky waters of qualified immunity. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021). The Court thus declines to grant Funchion qualified immunity in the alternative.

### E.     Count Six: The FDDPA

Finally, the plaintiffs claim that Caez and Sparks violated the FDPPA by misusing federally protected driver information. The FDPPA prevents the disclosure of information assembled by a state Department of Motor Vehicles ("DMV."). Congress passed it to address: (1) stalkers and other criminals who could use the information in crime; and (2) companies

who could purchase and deploy the information for direct marketing. *Fontanez v. Skepple*, 563 F. App'x 847, 848–49 (2d Cir. 2014). "To establish a claim under the DPPA, the plaintiff must establish: (1) that the defendants caused a DMV search to be made as to each plaintiff and (2) that the search was not permitted by any exception to the DPPA." *Luparello v. Inc. Vill. of Garden City*, 290 F. Supp. 2d 341, 344 (E.D.N.Y. 2003).

This claim only applies to Czar, as Parsons does not allege a violation of the FDPPA. Both Caez and Sparks "caused" a search to be made, even if a dispatcher conducted the actual search of Czar's information. Regardless of the mechanism of the search, Section 2721(b)(1) of the FDPPA lists the use of DMV information for carrying out government agency functions as an exception to its prohibitions. 18 U.S.C. § 2721(b)(1). It is undisputed that a query for Czar's information was conducted during Caez's response to a complaint of an erratic driver and that, after the query, Caez then completed a report and infraction. Czar's claims thus fail, as the search in question, whether caused by Caez or Sparks, was conducted according to normal law enforcement functions, for the purposes of investigating the incident that occurred in June 2019.

## IV. CONCLUSION

For the foregoing reasons, both motions for summary judgment (ECF Nos. 49 and 52) are **granted**. Judgment is entered in the defendants' favor. As there are no remaining claims, the Clerk is directed to close this case.

**SO ORDERED.**

Hartford, Connecticut
June 6, 2024

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

15